THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN PETERS, Plaintiff in Error.

*Opinion filed October 16, 1914.*

1. BRIBERY—*at common law, bribery and attempt to bribe were punished in the same way.* At common law, bribery was a misdemeanor and the distinction between bribery and attempt to bribe was of little practical importance, as the offer to bribe, although there was no acceptance or delivery of the gift or reward, was indictable and punishable in the same way as though there had been delivery and acceptance.

2. SAME—*in Illinois both parties must have acted corruptly to constitute bribery.* Under section 31 of the Criminal Code the offense of bribery requires not only a corrupt motive upon the party offering the bribe but also a corrupt motive on the part of the person accepting the same, and if the officer sought to be bribed merely accepts the money with the intention of bringing the other party to justice the offense is only an attempt to bribe.

3. SAME—*effect where State's attorney arranges trap for suspected briber.* The facts that the State's attorney secretes witnesses in his room to overhear a conversation between himself

and a person who he believes is about to offer him a bribe, and that he pretends to accede to such person's overtures and sends a third person into the room to receive the money offered, do not relieve the act of its criminal character as an attempt to bribe.

4. SAME—*defendant has a right to testify as to his intent in paying money.* In a prosecution for bribery the question of the defendant's motive, intention or belief in paying over the money is an important element of the offense, and the defendant has a right to testify as to what such motive, intention or belief was.

WRIT OF ERROR to the Circuit Court of St. Clair county; the Hon. GEORGE A. CROW, Judge, presiding.

H. E. SCHAUMLEFFEL, and D. J. SULLIVAN, for plaintiff in error.

P. J. LUCEY, Attorney General, CHARLES WEBB, State's Attorney, and GEORGE P. RAMSEY, (A. B. DAVIS, of counsel,) for the People.

Mr. JUSTICE CARTER delivered the opinion of the court:

Plaintiff in error, John Peters, was found guilty of bribery in the circuit court of St. Clair county and sentenced to the penitentiary. He has brought his case to this court on writ of error.

Peters was the proprietor of a saloon in the south-eastern part of St. Clair county. Charles Webb, the State's attorney of that county, accompanied by various officers and others, visited the saloon one evening about October 3, 1913, and caused the arrest of Peters for keeping and operating a slot machine. It was arranged that the machine should be delivered the next morning to a man who would come around with a van collecting a number of slot machines confiscated at the same time in that locality. Peters was instructed to go before a justice of the peace the following morning and give bond for his appearance before the grand jury or take such other course permitted by law as he desired. Accordingly he went before a justice of the peace

on the following day, waived preliminary examination and gave bond. At the time he was arrested for operating the slot machine he said to the State's attorney that he had been a good friend of his and had supported him during his campaign for election and thought the State's attorney ought not to force him to pay a fine for operating the machine. The State's attorney testified that he replied that he could do nothing else. Three or four days later, while the State's attorney and one Curtis A. Betts were on their way to lunch in the city of East St. Louis they met plaintiff in error. According to the State's attorney, Peters said, "Now, Charley, I would like to have this thing kept out of the courts and it ought to be fixed up," and when the State's attorney replied that he did not know how it could be done, Peters said, "Oh! you know and I know how these things are done, and you know you can lose that case." The State's attorney testified that he replied that he did not want to talk to plaintiff in error about it. Betts testified, and so far as he heard the conversation he substantially agreed with Webb's testimony. Peters stated on the stand that he said to Webb, "I would like to square it and get out of it; it troubles my mind, and I have never been in trouble in my life before." The State's attorney testified that later, on October 11, at a restaurant in East St. Louis where he was eating lunch with his assistant, A. B. Davis, Peters, who had taken his lunch at the same place, passed his table and whispered in the State's attorney's ear that he wanted to see him about that matter. The State's attorney testified that he said, "I will be in my office at three o'clock, in the Arcade building," and that Peters said, "I will be there at three o'clock; you know what I want." After Webb left the restaurant he saw Betts and talked over the matter with him. Betts was a newspaper reporter on one of the St. Louis papers and had been for several months doing detective work and looking up evidence for State's attorney Webb. They arranged a plan to have the conversation be-

tween Webb and Peters overheard when the latter came in, in the afternoon. In the back room of the State's attorney's office was a rattan couch covered with bed clothing apparently reaching very near the floor. Webb and Betts called to their assistance Charles P. Webb, a young man twenty-six years old and a nephew of the State's attorney, and one Schenck, of about the same age. The two young men crawled under the couch shortly before Peters was to appear. Betts and a constable were instructed to be in an adjoining room at three o'clock. At that time, according to the State's attorney's testimony, the plaintiff in error came into the office and Webb took him into the back room, where the couch was situated, and they sat down near a table. The State's attorney testified that he asked Peters what he wanted, and the latter replied, "Of course you know what I want; I don't want to be indicted; I don't want to be fined; I am not making a great deal of money down there where I am running this saloon and cannot afford to pay a fine, and I want it fixed up." The State's attorney testified that he replied he did not think he could fix it up; that Peters said, "Well, I brought $20 that I expected to fix it up with;" that after the State's attorney told him that the smallest amount he could fix it up with was $135 or $140 under the law and that it could not be settled out of court, Peters said, "I know it has been done and I know those things are done;" that after some further talk the State's attorney said, "What do you want to do?" and Peters replied, "Well, I want to pay you $20, and, besides, I am going to buy my brother's saloon, out near Washington Park, * * * and I will be able to run a poker game in that saloon and make from $20 to $40 a month; * * * it will be outside of St. Louis and nobody can bother me and I will pay you anywhere from $25 to $40 a month, depending on the value of the game;" that the State's attorney then said, "I will not take your $20 but I will send a man in here and you can talk with him."

Webb then sent Betts into the room where plaintiff in error was. Betts testified that Peters handed him a $20 bill and that he asked Peters what it was for, and the latter replied, "You know all about this;" that thereupon Betts asked, "Well, is this carrying out the understanding you reached with Webb just now?" and Peters said, "Yes, that is it." Thereupon Peters handed Betts the $20 bill and asked for a receipt for it, which Betts gave him. Webb and the constable then came into the room and Webb stepped to the couch and lifted it from over the two young men. Webb then ordered the constable to arrest Peters. When the couch was lifted Peters raised his hands and said, "Oh! my God!" and also something to the effect that he thought before that the State's attorney was smart but now he knew it. The two young men testified substantially the same as to what took place in the room as did Webb and Betts.

Peters' account of the transaction was, that when he went to the State's attorney's office Webb first asked him to go to a saloon down-stairs and have a drink; that after they returned they went into a back room and the following took place: "I went in and we sat down at a long table, and he says, 'Do you know what the costs in this case is?' I says, 'I have no idea, Charley,' and he says, 'The costs is $115,' and I says, 'Gee! That much for the first offense?' and he says, 'Yes, I get $15 out of that.' I says, 'Is that all you get out of it?' and he says, 'That is all.' And he says, 'How much are you willing to pay?' and I says, 'I don't know, Charley; I won't say; I may say too much or not enough.' And he says, 'You will tell somebody,' and I said, 'No, I won't,' and he says, 'Oh! you will tell somebody,' and I says, 'No, I won't; I won't even tell my wife; I know my business.' And he says, 'How will $25 do?' I studied awhile and I said I was a poor devil and it was hard to make a living, and I says, 'Now is your time to show leniency for what I done for you,' [when Webb was

a candidate,] and he says, 'All right; $20 will do.' He says, 'I will not take it myself; I will send a man in and he will take it,' and I said, 'All right; it is up to you; I am satisfied.' " His account of what took place after Webb walked out and Betts came into the room is substantially the same as that given by the other witnesses. Webb testified positively that he did not first take Peters down to a saloon and treat him.

Counsel for plaintiff in error first argue that if he is guilty of any criminal offense in this case, under our statute it is the offense of an attempt to commit bribery and not the offense of bribery itself. Section 31 of the Criminal Code, so far as it applies to this question, reads as follows: "Whoever corruptly, directly or indirectly, gives any money or other bribe * * * to any State's attorney * * * after his election, * * * either before or after he is qualified, with intent to influence his act, vote, opinion, decision or judgment on any matter, question, cause or proceeding which may be then pending, or may by law come or be brought before him, in his official capacity, or to cause him to execute any of the powers in him vested, or to perform any duty of him required, with partiality or favor, or otherwise than as required by law, * * * the person so giving, and the officer so receiving any money * * * with intent or for the purpose or consideration aforesaid, shall be deemed guilty of bribery, and shall be punished by confinement in the penitentiary for a term not less than one year nor more than five years." Section 32 of the Criminal Code reads: "Every person who shall offer or attempt to bribe any * * * State's attorney or other officer, ministerial or judicial, * * * in any of the cases mentioned in the preceding section, and every such officer who shall propose or agree to receive a bribe in any of such cases, shall be fined not exceeding $5000."

Bribery, under the common law, is usually defined to be the giving or receiving anything of value, or any valuable

service, intended to influence one in the discharge of a legal duty. (4 Am. & Eng. Ency. of Law,—2d ed.—907; 1 Russell on Crimes,—7th Eng. and 1st Can. ed.—627; 3 Greenleaf on Evidence,—16th ed.—sec. 71; 3 Wharton on Crim. Law,—11th ed.—sec. 2214; *Rex* v. *Vaughan,* 4 Burr. 2494.) At common law bribery was a misdemeanor, and the distinction between bribery and the attempt to bribe was of little practical importance, as the offer to bribe, though there was no acceptance or delivery of the gift or reward, was indictable and punishable in the same way as if there had been both delivery and acceptance. (*State* v. *Ellis,* 97 Am. Dec. (N. J.) 707, and authorities cited in note; *Rudolph* v. *State,* 116 Am. St. Rep. 32, and note.) In many States and jurisdictions, as in Illinois, separate statutes have been enacted as to bribery and the attempt to bribe and different punishments fixed for the two offenses. What are the necessary elements of the crime of bribery and that of an attempt to bribe will depend, therefore, quite largely upon the wording of the particular statute under consideration. In some jurisdictions, in order to constitute bribery the act of at least two persons is essential and it must be proved that the minds of the two concur, (*Newman* v. *People,* 23 Colo. 300; 2 Ency. of Evidence, 763;) while in others, upon the full and complete delivery of the bribe or money, so that it is out of the possession and control of the person making the delivery with the corrupt intention, on his part, of influencing the public official, the offense is complete, although the official received it in ignorance or retained it solely for the purpose of public justice. (*Commonwealth* v. *Murray,* 135 Mass. 530; *Henslow* v. *Fawcett,* 3 Ad. & Ell. 51.) The gist of either offense is the tendency of the bribe to pervert justice. Such being the case, the attempt to bribe, as well as the completed act of bribery, is dangerous and injurious to the community at large, for, as this court has said in *Walsh* v. *People,* 65 Ill. 58, "the offer is a sore temptation to the weak or the de-

praved. It tends to corrupt, and as the law abhors the least tendency to corruption it punishes the act, which is calculated to debase and which may affect prejudicially the morals of the community." The legislature, in passing the two sections of the Criminal Code in question, evidently thought that the completed act was more serious and corrupting in its tendency than an ineffectual attempt to bribe. Reading these two sections together, did the legislature intend that in order to constitute the crime of bribery the acts of two persons were essential?—that of him who gives and him who receives, the minds of the two concurring? Or did they intend that the offense of bribery was complete if the public official took the money or other thing offered as a bribe but not with a corrupt intent? No one reading this record would for a moment contend that the State's attorney was guilty of bribery. In the common understanding of that term no one would argue that he had been bribed. If he, instead of having Betts receive the $20, had in his interview told plaintiff in error positively that he would not accept the money under any circumstances and ordered him out of his office, it would hardly be contended that plaintiff in error would then be guilty of more than an attempt to bribe. Bishop, in discussing bribery and the attempt to bribe, says: "Since bribery is misdemeanor and attempt is the same it is of little consequence which form of the doctrine we follow, the result in either case being the same. But it promotes a desirable uniformity in the terms of the law to treat of the unaccepted offer as an attempt,—not as the substantive crime." (2 Bishop's New Crim. Law, sec. 88.) Greenleaf says: "The misdemeanor is complete by the offer of the bribe, so far as the offer is concerned. If the offer is accepted both parties are guilty." (3 Greenleaf on Evidence,—16th ed.—sec. 72.) If the offer is accepted with a corrupt motive both parties are guilty of bribery, even though the public official changes his mind and breaks his promise. (*Sulston* v. *Norton,* 3 Burr. 1235.)

265 – 9

This offer was not accepted by the State's attorney in any true sense of the meaning of that word. We must assume that the legislature had in mind, in the passage of these two sections of the Criminal Code distinguishing between bribery and the attempt to bribe, the common law as it existed at that time. This being so, the conclusion logically follows that they did not intend that a person should be guilty of the offense of bribery unless the bribe was accepted. It must therefore be held that plaintiff in error cannot, on the facts in this record, be held guilty of bribery.

Counsel further argue that plaintiff in error, under these facts, was not guilty even of an attempt at bribery. With this we do not agree. This case does not come within the reasoning of this court in *Love* v. *People,* 160 Ill. 501, where it was held that the offense of burglary there under consideration was committed at the instigation and encouragement of the owner of the premises, but rather comes within the reasoning of this court in *People* v. *Smith,* 251 Ill. 185, and *People* v. *Hartford Life Ins. Co.* 252 id. 398, where it was stated it was not in violation of the law to find out whether offenses were being committed and to take precautions to ascertain whether the suspected persons would commit the offense. The evidence justifies the submission of this last mentioned offense to a jury.

Counsel further contend that the court erred in refusing to permit plaintiff in error to testify as to his intention in giving the $20 to Betts for the State's attorney. The prevailing rule of law, sustained by the great weight of authority, is, that whenever the motive, intention or belief of a person is relevant to the issue it is competent for such person to testify directly on that point. (Jones on Evidence,—2d ed.—sec. 170.) This court has held that where the intent is an important element constituting the offense the accused has the right to testify what his intention was in the commission of the act. (*Wohlford* v. *People,* 148 Ill. 296.) The court erred in not permitting plaintiff in er-

ror to answer the question. We do not think, however, we would reverse for that error alone, as a reading of his examination shows that he gave practically a complete statement as to what his intention or motive was.

For the reasons stated the judgment must be reversed and the cause remanded. *Reversed and remanded.*